*NEWARK (CITY) v. NEWARK NAT. GAS & FUEL CO.

1. **Municipal Power to Regulate Price of Gas and Electricity, Exercise Presumed Fair.**

    Municipal corporations, by virtue of Sec. 3982 G. C., authorizing councils to regulate the price gas and electric companies may charge consumers, are clothed with power to fix the maximum rate to consumers furnished and in the absence of proof to the contrary the presumption is that a municipal council in the exercise of this regulation acted with due regard to the rights of the consumer and furnisher.

2. **Court Determines Reasonableness of Gas Rate but does not Fix Rates.**

    The power to regulate rates for gas and electricity furnished the public in municipalities under Sec. 3982 G. C. does not reside in the courts, the latter are limited to the judicial determination of the reasonableness of the rate fixed.

3. **Gas and Electric Utilities and Public have Reciprocal Rights in Gas Rates.**

    Gas and electric light and power companies supplying private consumers are entitled to a fair return upon the reasonable value of that produced for the public convenience, and the public is reciprocally entitled to demand that no more be exacted from consumers than what is furnished is reasonably worth. In fixing such rates both corporation and public are to be equally considered.

4. **Value of Plant, Net Profits, Fair return Basis for Determining Reasonableness of Council Rates.**

    Courts determining the reasonableness of rates fixed by ordinance of municipality for gas and electricity to the public, (1) are to ascertain at the time the value of the plant furnishing, (2) the total net profits under rates fixed, (3) whether such profits provide a fair return on the reasonable value of the plant.

5. **Relative Location to Local Gas Field Element in Determining Rate if Confiscatory.**

    A municipality, situated substantially contiguous to a local natural gas field, considered in connection with the fact that for several years prior citizens thereof had been furnished with gas at a rate not in excess of that prescribed by ordinance, is entitled to a lower rate for gas than the market value of gas in more distant municipalities. Hence, if at such rate a gas company makes a profit from eight to ten per cent for several years, no confiscatory rate is established.

*Affirmed, no op., Newark Nat. Gas & Fuel Co. v. Newark, 91 O. S. 000; 60 Bull. 506.

Newark v. Natural Gas & Fuel Co.

**6. Absence of Consent of Gas Company to Rate Prescribed not Denial of Protection of Law.**

> A municipal ordinance, fixing for five years a maximum rate for gas is a regulation of property clothed with a public interest, and, though without the consent of the gas company, it does not deny the equal protection of the law and due process of law, if the rate prescribed has and will produce an adequate return to the gas company.

**7. Fair Test of Rate Prerequisite to Restraining Imposition of New Rate.**

> Courts will decline to interfere by injunction with rate making legislation before a fair test is made; if the rate should subsequently appear to be confiscatory it will be soon enough for the courts to afford a remedy.
>
> [Syllabus approved by the court.]

ERROR to common pleas court.

*Frank A. Bolton, Roderic Jones, Kibler & Kibler,* and *Ralph Norpel,* city solicitor, for plaintiff.

*S. M. Douglas, Eugene Mackey,* and *Fitzgibbon & Montgomery,* for defendant.

SHIELDS, J.

On March 6, 1911, the city council of the city of Newark, Ohio, duly passed a city ordinance fixing the maximum price of natural gas to be charged by the Newark Natural Gas & Fuel Co., its successors or assigns, for the period of five years next ensuing, at twenty cents per thousand for each cubic foot of gas used or consumed by all persons, firms or corporations using or consuming the same, with a discount of 10 per cent allowed if payment was made on or before the tenth day of the succeeding month. Declining to accept the provisions of the ordinance, the defendant company, which for years had been and then was supplying said city and its citizens with gas under an ordinance of said city passed February 21, 1898, immediately caused notice to be given to its consumers of gas by publication that on and after the April, 1911, reading of meters the price to be charged for gas would be twenty-five cents for each thousand cubic feet, subject to a discount of 10 per cent if paid on or before the tenth of each succeeding month and that unless said price was so paid the further supply of gas to said city and its citizens would be discontinued. Soon after said publication was

made a petition was filed by the city of Newark, by Frank A. Bolton, its solicitor, in the court of common pleas of Licking county, Ohio, to enforce by mandatory injunction the provisions of said city ordinance passed March 6, 1911.

Stating it more fully and at length, said petition recites:

That the said Frank A. Bolton is the duly elected, qualified and acting solicitor of the city of Newark, Ohio, a municipal corporation and that said action is brought by direction of its city council. That the defendant, the Newark Natural Gas & Fuel Company, is a corporation and is furnishing natural gas for fuel and light to said city and its inhabitants by virtue of a franchise granted by the said city council by ordinance passed February 21, 1898, by the terms of which there was granted to the defendant company the right and privilege of laying pipes in and through the streets and alleys and public grounds of said city for the purpose of supplying and conveying natural gas or fuel gas to the inhabitants of said city for a period of twenty-five years. That for the period of ten years from the passage of said ordinance, the defendant company was entitled to charge consumers of gas, who are inhabitants of said city, for gas furnished at the rate of twenty-five cents for one thousand cubic feet. That within ninety days after the passing and taking effect of said ordinance the acceptance thereof by said defendant was required to be filed with the said city council. That said ordinance was duly published as required by law. That within ninety days from the passing and taking effect of said ordinance, to wit, March 21, 1898, the defendant company accepted the same in writing. That a copy of said ordinance and the acceptance thereof by the defendant company is attached to said petition.

That from the date of the passage of said ordinance franchise up to the sixth day of March, 1911, said city council passed no further ordinance regulating the price to be charged by the defendant company to said city and its inhabitants for fuel and light, or either. That ever since the passage and acceptance of said ordinance the defendant company has been continuously, and now is supplying gas to said city and its

Newark v. Natural Gas & Fuel Co.

inhabitants by virtue of the rights and privileges granted by said ordinance.

That on the said sixth day of March, 1911, said city council duly passed an ordinance regulating and fixing the maximum price the defendant company may charge consumers thereof, whether the city itself or its inhabitants, under said franchise for the period of five years at the rate of twenty cents per thousand cubic feet of natural gas for fuel and light, meter measurement, with 10 per cent discount on all bills paid before the tenth of each succeeding month. That said last named ordinance was on the ninth day of March, 1911, duly signed, approved by the mayor of said city, and was published as required by law, a copy of which ordinance is attached to said petition. That said last named ordinance is now in full force and that the price as therein fixed by said city council is the same price that the defendant company has been and is now charging said city and its inhabitants who have been and now are consumers of gas in said city, and ever since the defendant began furnishing gas under the ordinance granting said franchise. That the defendant company had due knowledge and notice of said ordinance passed March 6, 1911.

That the defendant company is notifying and has notified said city and the inhabitants thereof that on and after the April, 1911, reading of meters the price charged for gas would be twenty-five cents for one thousand cubic feet, subject to a discount of 10 per cent if paid on or before the tenth day of the following month, and it threatened that unless said price is paid by said city and its inhabitants on or before May 10, 1911, the defendant company would stop the supply of gas and refuse to furnish gas for fuel and light to said city or any of the inhabitants who refused to pay said price so fixed by the defendant company. That the said defendant company insists upon its right to make the price for all gas furnished to said city and its inhabitants, on and after April 1, 1911, the sum of twenty-five cents per thousand cubic feet, subject to said discount of 10 per cent, and no less, and unless restrained by the court, all consumers of gas furnished by the defendant com-

pany would be required to pay twenty-five cents per thousand cubic feet, subject to said discount on and after May 1, 1911, contrary to the provisions of said ordinance of March 6, 1911.

That for the purpose of avoiding a multiplicity of suits for the defendant company's threatened refusal to comply with the provisions of said ordinance of March 6, 1911, said solicitor brings this suit.

The plaintiff further says that said city and its inhabitants are each and all of them without remedy at law and can get no relief from the processes of a court of equity, and they have no adequate remedy at law.

Wherefore, the plaintiff prays that on the final hearing of this cause the defendant company may be perpetually enjoined from charging, collecting, or in any manner attempting to collect from said city, or any of its inhabitants any other, greater or further sum for gas by it delivered for heat and light than the maximum sum or rate fixed by said ordinance passed March 6, 1911, and that the defendant company be enjoined to specifically perform said ordinance and franchise, and that pending the final hearing of said case a temporary injunction issue to a like effect, restraining the defendant company in like manner and for all other and further relief to which said city or any of its inhabitants may be entitled in equity.

Upon the foregoing petition being filed, a temporary injunction was allowed to issue as prayed for in said petition, except as to the specific performance of said ordinance, by Chas. W. Seward, judge of the court of common pleas of said county.

In its amended answer to said petition the defendant company sets up four separate defenses, and for its first defense says:

It denies that it threatens or has threatened that the defendant company would stop the supply of gas and refuses to furnish gas to said city or any of its inhabitants who refuse to pay the price fixed by said defendant company; that while it admits that said ordinance of March 6, 1911, was passed in due form by said city council, fixing the price that the defendant may charge consumers, it avers that said ordinance is unreason-

Newark v. Natural Gas & Fuel Co.

able, and that the rate fixed denies to the defendant any adequate profit for the five years next ensuing and operates as a fraud upon the property rights of the defendant, and is therefore unreasonable and void, and it denies all the other averments in said petition not expressly admitted in said ground of defense set up in said amended answer.

For a second defense the defendant says that said ordinance of March 6, 1911, is contrary to and in violation of Sec. 1 of Art. 1 of the bill of rights of the constitution of the state of Ohio and is therefore null and void and of no effect for the reason that said ordinance is violative and a denial of the due protection and possession of the property of said defendant without its consent.

For a third defense the defendant says that said ordinance of March 6, 1911, is contrary to and in violation of Sec. 19 of Art. 1 of the bill of rights of the constitution of the state of Ohio and is therefore null and void and of no effect, for the reason that it is the taking of private property without due process of law, in that said ordinance attempts to compel the defendant to furnish gas at a price without just compensation or profit and without any equivalent or just compensation in money and against and without the consent of the defendant.

For a fourth defense the defendant says that said ordinance is contrary to and in violation of Sec. 1 of the fourteenth amendment to the constitution of the United States and is therefore null and void and of no effect for that it is a denial to this defendant of the equal protection of the laws and without due process of law, in this, that it tends and is designed to compel the defendant company to furnish gas for a period and at a price without adequate return, compensation or profit and without the consent of the defendant.

The defendant prays that the temporary restraining order granted herein may be dissolved; that the prayer of the petition be denied and that said ordinance of March 6, 1911, be declared unreasonable, null and void and for all proper relief.

After a demurrer was overruled to the second and third defenses of the defendant company's amended answer, a reply

was filed by the plaintiff, and replying to the first defense therein denies that said ordinance of March 6, 1911, is unreasonable, and it denies that the rate fixed by said ordinance denies to the defendant company any adequate profit for the five years next ensuing and operates as a fraud upon the property rights of the defendant and is therefore unreasonable and void.

And for a reply to the second, third and fourth defenses of said defendant's amended answer the plaintiff denies each and all of the allegations therein contained.

The case comes into this court by appeal from the judgment of the court of common pleas of said county and was tried upon the evidence introduced in support of the issues raised by the pleadings filed in the case.

While there are several defenses pleaded in the amended answer of the defendant company, when taken together, they substantially raise the same question and make the same defense, namely, that the ordinance of March 6, 1911, is constitutionally invalid, both under the constitution of the United States and under the constitution of the state of Ohio, because said ordinance fixes a maximum rate to be charged by the defendant company for the supply of natural gas to the city of Newark and its citizens for the period of five years from the date of its passage and taking effect that is both unreasonable and confiscatory in its effect, and that said ordinance is therefore null and void.

The power given by statute to the council of a municipality to regulate the price of natural gas is to be found in Sec. 3982 Gen. Code, which provides that:

"The council of a municipality in which electric lighting companies, natural or artificial gas companies, gas light or coke companies, or companies for supplying water for public or private consumption, are established, or into which their wires, mains or pipes are conducted, may regulate from time to time the price which such companies, may charge for electric light, or for gas for lighting or fuel purposes, or for water for public or private consumption, furnished by such companies to the citizens, public grounds, and buildings, streets, lanes, alleys,

Newark v. Natural Gas & Fuel Co.

avenues, wharves, and landing places, or for fire protection. Such companies shall in no event charge more for electric light, natural or artificial gas, or water, furnished to such corporation or individuals, than the price specified by ordinance of council," etc.

It will thus be seen that the term "regulate" is employed in the foregoing statute. Evidently the statute contemplates that the power thus given in fixing rates shall not be exercised short of an impartial and thorough investigation into all the facts with the ultimate object of doing justice both to the public service corporation and to the public. It does not contemplate an arbitrary fixing of rates irrespective of the rights of the corporation or the public, but reasonable rates and just compensation, and to do otherwise would be violative of the spirit of the statute and of public duty. What was actually done in the premises by the city council is not now before this court and the presumption is, in the absence of proof to the contrary, that it acted with due regard to the rights of both the corporation and the public. And that it was clothed with power to regulate the price of gas to be furnished by the defendant company is not open to question.

Said ordinance having been passed by the council, signed and approved by the mayor and having become operative after publication, what then? The defendant company not only refused to comply with its terms but notified its consumers of gas that on and after the April, 1911, reading of meters that the price to be charged for gas would be twenty-five cents for one thousand cubic feet, subject to a discount of 10 per cent if paid on or before the tenth day of the succeeding month. It is fair to assume that this action was taken for the reasons set forth in the defendant company's amended answer.

As has already been pointed out, the city council has the power to regulate by ordinance the price of gas in municipalities, but this power does not reside in the court, whose province and duty it is to judicially declare whether or not the rate fixed in said ordinance is reasonable or otherwise. With this duty discharged its power is exhausted. What constitutes reasonable

rates for this purpose is a subject that has given the courts no little concern. The various conditions that may be present in one case may be absent in another. Hence there is no uniform rule laid down to be followed by courts, for no particular rates can be established for all cases. Quoting from the opinion of Justice Peckham in the case of *Wilcox* v. *Gas Co.* 212 U. S. 19, 48 [29 Sup. Ct. Rep. 192; 53 L. Ed. 382; 15 Ann. Cas. 1034]:

"There is no particular rate of compensation which must, in all cases and in all parts of the country, be regarded as sufficient for capital invested in business enterprises. Such compensation must depend greatly upon circumstances and locality; among other things, the amount of risk in the business is a most important factor, as well as the locality where the business is conducted and the rate expected and usually realized there upon investments of a somewhat similar nature with regard to the risk attending them. There may be other matters which, in some cases, might also be properly taken into account in determining the rate which an investor might properly expect or hope to receive and which he would be entitled to without legislative interference. The less risk the less right to any unusual returns upon the investments. One who invests his money in a business of a somewhat hazardous character is very properly held to have the right to a larger return without legislative interference than can be obtained from an investment in government bonds or other perfectly safe security."

It will thus be seen that locality, risk and other considerations may enter into the reasonableness of the rates fixed. And in fixing such rates the rights of both the corporation and the public are to be equally considered. The ends of justice would not be met by disregarding the interests of either. On the one hand the company is entitled to a fair return upon the reasonable value of that which it employs for the public convenience, and on the other hand what the public is entitled to demand is that no more be exacted from it than what such company furnishes is reasonably worth.

In *Covington & L. Tpk. Road Co.* v. *Sanford,* 164 U. S. 578, 597, 598 [17 Sup. Ct. Rep. 198; 41 L. Ed. 560], Justice Harlan, speaking for the court, says:

Newark v. Natural Gas & Fuel Co.

"In short, each case must depend upon its special facts, and when a court, without assuming itself to prescribe rates, is required to determine whether the rates prescribed by the legislature for a corporation controlling a public highway are, as an entirety, so unjust as to destroy the value of its property for all the purposes for which it was acquired, its duty is to take into consideration the interests, both of the public and of the owner of the property, together with all other circumstances that are fairly to be considered, in determining whether the legislature has, under the guise of regulating rates, exceeded its constitutional authority, and practically deprived the owner of property without due process of law.

"The utmost that any corporation, operating a public highway, can rightfully demand at the hands of the legislature when exerting its general powers is that it receive what, under all the circumstances is such compensation for the use of its property as will be just, both to it and to the public."

Again, in *San Diego Land & Town Co.* v. *National City,* 174 U. S. 739 [19 Sup. Ct. Rep. 804; 43 L. Ed. 1154] :

"What the company is entitled to ask is a fair return upon the value of that which it employs for the public convenience."

In *Wilcox* v. *Gas Co., supra,* it is held that:

"The rates must be plainly unreasonable to the extent that their enforcement would be equivalent to the taking of property for public use without such compensation as, under the circumstances is just both to the owner and to the public. There must be a fair return upon the reasonable value of the property at the time it is being used for the public."

Numerous other authorities might be cited sustaining this same view, but from the authorities cited we think it is apparent that the law enjoins upon a legislative body, such as a city council, in fixing rates for any public service corporation that they be so fixed as to be just, both to the corporation and to the public.

Is the rate fixed by the ordinance in question reasonable or otherwise? Was it fixed with reference to the rights of this corporation and of the public? If it was and it is reasonable,

Licking County Appeals.

the relief asked for by the defendant company should not be granted, but if it was not and it is unreasonable and it denies to the defendant company equal protection of the laws in attempting to compel it to furnish gas for a period and at a price without adequate return, without its consent, then such relief under favor of the fourteenth amendment to the constitution of the United States should not be denied.

We are therefore confronted with the inquiry, how is this court to determine whether or not the rate is reasonable or otherwise? What is the test to be applied? This question has been before the federal courts at various times and the rule there adopted in determining the reasonableness of rates is:

First, to ascertain the value of the plant of the corporation.

Second, to determine, if possible, the total amount of the net profits which it can earn under the rate fixed.

Third, whether the amount of said profits is sufficient to provide a fair return on the reasonable value of the plant.

A vast amount of testimony was introduced under these different heads, especially relating to the cost of the defendant company's plant, including promotion and organization cost, construction and engineering work, the risks incident to the production and distribution of gas, the necessity of maintaining a large reserved area of gas-developed territory to meet exigencies liable to arise in the various sources of supply, the market price of gas delivered at Newark, etc. Indeed the variety of subjects is so great and the testimony relating thereto so voluminous, a large part of which consists of expert testimony, it would seem that their intelligent solution would be aided by the services of a well-trained and experienced gas expert. But in its analysis the case will be found to present legal questions, the solution of which may be helpful in enabling the court to reach a better understanding of the facts in the case.

Let us take up and consider the first proposition, namely, the value of the plant of the defendant company and the elements that should be considered in arriving at such value and when the valuation should be determined.

In McQuillan, Munic. Corp. 1750, the rule is stated as follows:

Newark v. Natural Gas &˙Fuel Co.

"The only practical test for determining the amount on which the public service company is entitled to a fair return is˙the present value of the property of the company at the time of the inquiry."

In Dillon, Munic. Corp. 1331,, it is laid down that:

"When the inquiry is directed to the reasonableness of the compensation, founded upon a fair return to the corporation upon the value of the property used for the public, the value of such property is the basis of that inquiry."

Under the rule laid down by the foregoing authorities supported by numerous adjudicated cases, the rule appears to be well established that the value of the property at the time of the fixing of the rates is the basis of valuation to be employed in determining the reasonableness of such rates.

The testimony shows that the defendant company was incorporated in 1889 with a capital stock of $81,600 and that no additional capital has ever been put into it for any purpose, except such as has been ·taken out of the earnings of the. company.

The history of the company consists of there periods, the Everett management, extending from 1889 to 1898, the Logan management from 1898 to 1902 and the Union Gas Corporation from 1902 to the present time.

The value of this property rests upon evidence furnished largely by the defendant company, supplemented by evidence covering the result of an examination made of its books by an expert accountant. As tending to show the value of the defendant company's property, R. S. Lord, a witness for said company, testified that he was employed by it in March, 1912, to examine said property and then placed a value on it at $309,-000. (See record pages 366-385.) In estimating such value the original cost of much of the material employed in the construction of said company's plant seems to have been based upon an examination of the books of the company and information furnished him. In making such estimate he testified that 50 per cent deduction from the original cost of the line between Newark and Thurston, if the same is not in use, should be

made, namely, $24,000; that no allowance for financing expenses, or organization cost, or interest charges, etc., during the construction of said plant was included, and that no allowance was made for general depreciation of the plant covering a period of some ten years. The book value of the plant December 31, 1911, was shown to be $302,889.02, exclusive of allowance made for depreciation and franchise value. In June, 1902, the book value was shown to be $183,187.96, which amount was made up of various items as shown on page 541 of the record. In this estimate was included also an item of $60,000 for "rights of way." A. J. Drolet, general auditor of the Union National Gas Corporation of Pittsburgh, a witness for the defendant company, testified that although the books of said company showed that by an inventory then taken the franchise value was then entered on said books at $3,500, said sum was increased to $60,000 in six months after that time. The record on pages 542, 543 and 544 shows that said witness testified upon this subject as follows:

Q. Now, under the head of rights of way, what do you mean by that?

A. That is an account that we have. It is a franchise account. It is supposed to cover intangible values. We merely put it down. That is all; we had so many thousand consumers, and an investment of so much, and knowing about how much it ought to be per consumer, we noticed that there was a certain amount missing from the investment. We could not ascertain just where it was. It is a matter that has been ascertained by the accounting department, we are not authorities on that.

Q. As a matter of fact, it is simply a value that is put upon the franchise?

A. Yes, sir. Covering all intangible value.

Q. You had an inventory taken in 1902, in June?

A. Yes, sir, I think so.

Q. And that right of way was placed at $3,500?

A. Yes, sir.

Q. And was increased in December of the same year to $60,000?

Newark v. Natural Gas & Fuel Co.

A.    Yes, sir.   Because we did not believe $3,500 covered it.

Q.    Well, it did not cost anything?

A.    It is a question.   I don't know.   We knew that the plant was worth more than $123,000.

Q.    Your schedule shows the actual earnings and actual expenses of your company?

A.    Yes, sir.   This was merely an inventory.   I haven't that list of pipe and meters; that is all that I received in the Pittsburgh office—this list of material.

In view of the, fact that there was no absolute physical appraisement taken of the plant, nothing else was left for us but to extend the figures at what we thought was right.

Q.    And you voluntarily increased the investment of the company from $122,638, $60,000?

A.    Yes, sir.

Q.    In six months' time?

A.    That is a feature which we had omitted in the opening—

Q.    That was an inventory?

A.    Yes, sir, of the physical property.

Q.    In June, 1902?

A.    Of the physical property, yes, sir.

Q.    The physical property in June, 1902, was $122,000?

A.    That is what we thought it was.   We put $60,000 as being intangible.

Q.    And the $60,000 which you added was. the franchise value?

A.    Yes, sir.   What we estimated was the franchise value.

Q.    And you have nothing on your books to show that you paid anything at all for the franchise?

A.    Nothing at all, no, sir.

It would appear that if the foregoing illustrates the modern methods of bookkeeping in capitalizing corporation values, investigation may be helpful in disarming criticism that frequently follows where trust and confidence are fortified by book figures.

Evidence was also offered of the valuation placed upon this

property by the State Tax Commission for the years 1911 and 1912 at $572,450 and $435,670, respectively, while the value placed upon practically the same property by the company itself in the sworn statement of W. J. Broder, its secretary, for the years 1908, 1909 and 1910 (as appears on page 398 of the record) was $41,996, $47,114 and $47,706, respectively. By the authorities this evidence is held to be immaterial for valuation purposes except as it tends to show the value placed upon the property by the company.

It is difficult to arrive at anything like a satisfactory conclusion as to the value of the company's property in March, 1911, when it is considered that nothing was charged off for depreciation and that no definite showing appears of the actual operating expenses incurred, or an itemized account of the betterments made from year to year. It is well settled that a deduction should be allowed for depreciation from age and use of the plant when determining the present value of tangible property for the purpose of testing the reasonableness of rates fixed by a municipal ordinance. *Knoxville* v. *Water Co.* 212 U. S. 1 [29 Sup. Ct. Rep. 148; 53 L. Ed. 371].

As bearing upon a fair per cent to be deducted for. depreciation, Mr. Drolet testified that 5 per cent was a reasonable per cent. And it is also well settled that a further deduction for franchise value should be made. *Lincoln Gas & Elec. L. Co.* v. *Lincoln,* 182 Fed. Rep. 926, 928.

As already indicated, no such reliable and definite information was presented to the court to enable it to reach a conclusion wholly satisfactory to itself of the value of the defendant company's property in March, 1911, but in the light of the evidence introduced upon the subject, as we analyze it, and applying the rules of law already stated, the value of said property at that time appears to be $89,460.78. This amount may not be mathematically correct, owing to the incomplete and unintelligible condition of the company's books in respect to the disbursements made and profits earned by it during the time mentioned as the same appeared in the evidence, and in this connection the evidence of the expert witness, J. Hope

Newark v. Natural Gas & Fuel Co.

Sutor, who examined said books is not overlooked, but it is a result reached and verified by an examination involving a careful analysis of such evidence.

The second proposition, as stated, is to ascertain, if possible, the total amount of the net profits the defendant company can earn under the rate fixed.

This is a matter of no little importance to the defendant company, because whatever its earnings may have been prior to the passage and taking effect of the ordinance of March 6, 1911, conditions may have intervened increasing or decreasing the facilities and cost for supplying gas by the said company.

The claim made that natural gas is distinguishable from other public utilities in that its quantity or quality is beyond human control, and that there is ever present an element of risk attending its production and distribution, is not questioned, nor is the correctness of the claim challenged that the quantity of natural gas may be affected by decreased rock pressure as well as by other varying conditions, all of which no doubt would tend to increase the cost of production. These elements of uncertainty appear to be peculiar to the business, including also the risk attending the development of gas territory and other risks, too, necessarily connected with the production and transmission of gas, but these risks are such as are assumed by the investor, a fact, however, which should not and cannot weigh in considering the question under discussion here. In this enumeration of risks, it will be observed that the evidence given upon the subject refers to no one particular plant, but to the numerous plants of the Logan Company, whose property interests are admittedly large.

Among other things, it is urged by the defendant company that the wells in the Knox-Licking field (designated herein as the local field) have become so depleted of late, thereby increasing the cost of production, that neither the Logan Company, nor any other company, can furnish gas to the defendant company or the city of Newark and its citizens at the rate fixed by said ordinance with anything like a reasonable net profit on the value of its plant. If this claim is borne out by the facts, then the

equitable relief asked by the defendant company should be granted. But what are the facts in this respect as disclosed by the evidence? Undoubtedly the wells in the local field have become more or less depleted owing to the causes described, but the evidence shows that said wells at the beginning of this litigation yielded more than four times the quantity of gas consumed by the city of Newark and its citizens. True it is shown that only 60 per cent of the gas delivered at the city of Newark was of the product of said wells, and the balance is from the West Virginia field. If this condition prevails, there must be some reason for it, but no reason appears to be given, nor does the record show the cost to said company of producing gas in the local field, although there was no little testimony introduced by the plaintiff bearing upon the cost of producing natural gas in territory adjacent to the local field as evidenced by the contracts for its sale and delivery to various cities in this state. Omitting figures, it is sufficient to say that such testimony appears to warrant the statement that the cost of producing gas and its sale at the prices therein named about the time of the passage of said ordinance do not indicate that the rate fixed therein is confiscatory in its effect.

Considerable testimony was offered upon the trial showing the price of gas delivered to various cities in this state as tending to show the general market price thereof, delivered at the city of Newark. In the absence of any testimony tending to show the cost of producing and transporting gas to the city of Newark for distribution, such testimony would be entitled to no little weight, but what is the effect of such testimony as against proof of the cost of producing gas in the immediate vicinity of the local field, supplemented by proof as it was that gas was being furnished at that time by said company at the eighteen cent net rate? Situated as the city of Newark is, substantially contiguous to the local field, does not this fact when considered in connection with the admitted fact that the citizens of said city were supplied with gas by the same company for years prior to and up to the time of the passage of said ordinance at a rate not in excess of the rate fixed by said ordinance, minimize if not

Newark v. Natural Gas & Fuel Co.

nullify the legal effect of any showing of the market value of gas at said city at said time? Assuredly different conditions may exist in other cities where possibly the price of gas may be governed by the volume of the supply, and other considerations may also enter into the price there charged for gas, but as we view it, the real question made here is not what the prevailing price of gas at that time was elsewhere, but what was it reasonably worth when furnished to the citizens of Newark, in view of all the conditions here shown, and is the rate fixed by said ordinance such as to yield a fair return on the reasonable value of the company's property, above all legitimate and proper charges?

As we read the record, the earnings of the defendant company during the year 1911 were such as to pay over 10 per cent net profit, and that in 1910 they yielded a much larger net profit. True the record covering these two years, standing alone, and in the absence of other evidence, might not be a safe criterion upon which to base a judgment of the net earnings of the company before that time, but the evidence shows that the total net earnings of this plant were very profitable from the time it was first organized, yielding to the management from 1902 to December 31, 1911, an average annual net profit of over 8 per cent, during all of which said time said company charged the citizens of the city of Newark for gas the eighteen cent net rate. We do not feel called upon to pursue this inquiry further, feeling that the foregoing facts furnish their own comment, and while it is impossible to say with any degree of certainty what the net earnings of the company may be during the future five years' period, under said ordinance, it is reasonably safe to say that in view of the net earnings of the company during the period from 1902 to and including at least a portion of 1911, they will be such as to avoid the charge of being confiscatory in their effect.

We now reach the third and final proposition. Will the amount of net profit be such as to yield a fair return on the value of this plant? It would seem that the conclusion reached as to the second proposition herein ought to be a sufficient

answer to this inquiry, but we will notice some claims of counsel based upon said company's amended answer. Counsel for said company quote the following from the opinion of the court in the case of *New Memphis Gas & Light Co.* v. *Memphis,* 72 Fed. Rep. 952, 955.

"The state is under an obligation to act justly, and without arbitrary discrimination between corporations of the state, just as it is between citizens of the state enjoying the equal rights. The state cannot, under the guise of a regulation, bring about a destruction and a confiscation of the company's property; and the state's power to absolutely abolish the corporation must be distinguished from its power to destroy its business and confiscate its property so long as it chooses to permit its existence and to authorize its business by a valid charter. And the question of the reasonableness of a rate to charge is eminently a question for judicial investigation, requiring due process of law for its determination. And to deprive a company of the power of charging reasonable rates for the manufacture and sale of gas is to deprive it of the use of its property, and, in effect, of the property itself, without due process of law."

The foregoing embraces a concrete statement of the law. It tersely points out the constitutional guaranty afforded by the fourteenth amendment to the constitution of the United States and incidentally touches the vital question raised in this case wherein it is claimed that the defendant company is denied the equal protection of the laws and without due process of law, in that said ordinance seeks to compel it to furnish gas for a period and at a price without adequate return, without its consent.

It is to be remembered that the defendant company operated under another ordinance of the city of Newark in furnishing it and its inhabitants with gas and was so engaged at the time of the passage of the March 6, 1911, ordinance. Its relation to the public, therefore, then became fixed so far as being subject to public control.

In *Cotting* v. *Stock Yards Co.* 183 U. S. 79, 84 [22 Sup. Ct. Rep. 30; 46 L. Ed. 92], Justice Brewer, delivering the opinion therein quotes from *Munn* v. *Illinois,* 94 U. S. 113 [24 L. Ed. 77], as follows:

Newark v. Natural Gas & Fuel Co.

"Property becomes clothed with a public interest when used in a manner to make it of public convenience, and affect the community at large. * * * When, therefore, one devotes his property to a use in which the public has an interest, he in effect, grants to the public an interest in that business and must submit to be controlled by the public for the common good to the extent of the interest thus created. He may withdraw his grant by discontinuing the use but so long as he maintains the use, he must submit to the control."

As already indicated, this power of control lodged in the city council, under the statute, should be exercised not arbitrarily but with an unbiased judgment and discretion, and such a rate fixed as will afford to the company a just conpensation on the reasonable value of the plant at the time it was being used for the public—a rate that is just both to the company and to the public. "The idea of reasonableness is justice, and that which is unjust cannot be reasonable," says Justice Brewer, and it might here be remarked that courts have not been slow to safeguard property rights when the protection afforded by the fourteenth amendment to the constitution of the United States has been denied, nor on the other hand has the strong arm of the law been withheld from the public to protect it from imposition and wrong. With this record before us showing the net earnings of the company for the period named to be unusually large on what has been found to be the reasonable value of its plant, can the reasonableness of the rate fixed by said ordinance be successfully challenged as being obnoxious to or in contravention of the provisions of the said fourteenth amendment? The action of the city council being admittedly within the limits of legislative authority and its action being founded upon modes of procedure adopted for the government of municipal legislative bodies, such modes are to be regarded as due process of law. Having enacted this legislation the will of the city council, speaking through this ordinance becomes the law,— the law unto this corporation and all persons affected by it— unless it should be made to appear that the constitutional provision safeguarding property rights has been disregarded. Here

Licking County Appeals.

it is not claimed that there is any lack of uniformity in the operation of the said ordinance, or that there is any unjust corporate classification or discrimination made, but that it is here sought to take private property for public use without just compensation, in violation of the fourteen amendment which forbids any state "to deny to any person within its jurisdiction the equal protection of the laws." That corporations are persons within the meaning of this constitutional provision is well settled, and in view of the repeated adjudications of the highest court in the land upholding this constitutional provision it has become generally recognized that "no duty rests more imperatively upon the courts than the enforcement of this constitutional provision intended to secure that equality of rights which is the foundation of free government." Observing this injunction upon courts, What is the duty of this court in view of the record before us? Can it be said that the rate fixed by said ordinance is confiscatory in its effect, or that it will be during the future five years' period, in view of its net earnings shown for the period named when the price charged by the defendant company was at the eighteen cent net rate? Acting upon the well settled principle that rates will not be declared confiscatory unless clearly shown to be so, a majority of the court are of the opinion that the rate fixed by said ordinance is not unreasonable or confiscatory in its effect, and we therefore hold that neither of the several defenses of the defendant company, which has the burden of proof, is sustained by the evidence.

But there is another feature of this case which should not be overlooked, in our judgment, and that is that said ordinance has not had the test of actual experience. There was no showing made by the defendant company of the practical effect of the rate fixed by said ordinance from the date of its passage to the date of the trial in this court, a period covering three years and more. In the absence of a showing made by the defendant company, in a case permitting it, that such rate will not yield a fair return on the reasonable value of its property employed, should not courts hesitate to interfere with rate legislation before being advised of the practical result of such rate?

Newark v. Natural Gas & Fuel Co.

In Dillon, Munic. Corp. 1327, it is laid down that:

"The judiciary ought not to annul or set aside rates established by legislative action unless they are proven or shown to be such as to make their enforcement equivalent to the taking of property for public use without such compensation as under all of the circumstances is just, both to the owner and to the public, that is, judicial interference should not occur unless the case presents clearly such a violation of the rights of property under the form of regulation as to satisfy the court that the rates prescribed will have the effect to deprive the company of reasonable compensation for its services."

In *Knoxville* v. *Water Co. supra*, Justice Moody says:

"The jurisdiction which is invoked here ought, as has been said, to be exercised only in the clearest cases. If a company of this kind chooses to decline to observe an ordinance of this nature, and prefers rather to go into court with the claim that the ordinance is unconstitutional, it must be prepared to show to the satisfaction of the court that the ordinance would necessarily be so confiscatory in its effect as to violate the constitution of the United States."

Again, in *San Diego Land & Town Co.* v. *National City, supra*, Justice Harlan, speaking for the court, says:

"But it should also be remembered that the judiciary ought not to interfere with the collection of rates established under legislative sanction unless they are so plainly and palpably unreasonable as to make their enforcement equivalent to the taking of private property for public use without such compensation as under all the circumstances is just, both to the owner and to the public; that is, judicial interference should never occur, unless the case presents, clearly and beyond all doubt, such a flagrant attack upon the rights of property under the guise of regulations, as to compel the court to say that the rates prescribed will necessarily have the effect to deny just compensation for private property taken for public use."

Again, in *Wilcox* v. *Gas Co. supra*, Justice Peckham says:

"But, where the rate complained of shows, in any event a very narrow line of division between possible confiscation and

Licking County Appeals.

proper regulation, as based upon the value of the property found by the court below, and the defendant depends upon opinions as to value, which differ considerably among the witnesses, and also upon the results in future of operating under the rate objected to, so that the material fact of value is left in much doubt, a court of equity ought not to interfere by injunction before a fair trial has been made; if continuing business under that rate and thus eliminating, as far as is possible, the doubt arising from opinions as opposed to facts.''

From the foregoing it appears that the reasonable and safe rule for courts to follow is to decline to interfere by injunction with rate-making legislation before a fair test is made and shown of the practical effect of the rate fixed, to the end that courts may intelligently act upon evidence based upon the result of actual trial of such rate rather than speculation. As in the case of *Knoxville* v. *Water Co. supra,* so in this case, if it shall hereafter be made to appear under the actual operation of said ordinance that the returns allowed by it operate as a confiscation of property, the courts are open to afford a remedy.

The same decree may be entered herein as was entered in the court of common pleas.

**Powell, J.,** concurs.

**Voorhees, J.,** dissents.